UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

DEBORAH E. KELSEY, LYN COMFORT, :
R. DANIEL PRENTISS, and JAY R. WILSON :
   Plaintiffs :
:
v. : C.A. No. 14-
:
A. D. MAKEPEACE COMPANY :
   Defendant :

## COMPLAINT

### PARTIES AND JURISDICTION

1. Plaintiffs Deborah E. Kelsey, Lyn Comfort, R. Daniel Prentiss, and Jay R. Wilson (hereinafter, collectively, "Lenders") are citizens and residents of the State of Rhode Island.

2. Defendant A. D. Makepeace Company ("Makepeace") is a business corporation organized under the laws of the Commonwealth of Massachusetts, with its principal place of business in Wareham, Massachusetts.

3. Makepeace has sufficient contacts with the State of Rhode Island to make it subject to the *in personam* jurisdiction of this Court.

4. The amount in controversy is more than $75,000, exclusive of interest and costs.

5. This Court has jurisdiction over this matter by virtue of diversity of citizenship of the parties, pursuant to 28 U.S.C. § 1332.

### FACTUAL ALLEGATIONS

6. Makepeace in June, 2006 sold to Crane Landing Development, LLC, a limited liability company organized under the laws of the Commonwealth of Massachusetts, with its

principal place of business in Rhode Island ("Crane"), a tract of real property consisting of 25 lots in the Town of Wareham, Massachusetts ("Crane Premises").

7. Makepeace provided seller financing for Crane's purchase of the Crane Premises, and Crane incidental to the purchase executed and delivered to Makepeace a promissory note and mortgage deed.

8. In December, 2006, Makepeace sold another tract of land in Wareham, Massachusetts ("Tihona Premises") to Tihona Pond South, LLC, a limited liability company organized under the laws of the Commonwealth of Massachusetts, with its principal place of business in Rhode Island ("Tihona").

9. Makepeace provided seller financing for Tihona's purchase of the Tihona Premises, and Tihona, incidental to the purchase, executed and delivered to Makepeace a promissory note and mortgage deed.

10. Makepeace's sale of the Crane Premises to Crane was part of Makepeace's business plan to de-accession for commercial development real property that had been in agricultural use and that it had owned for many decades. Because it financed Crane's purchase of the Crane Premises, Makepeace's ability to realize its business plan of converting its landholdings to liquid assets depended on Crane's success in developing and selling the lots in the Crane Premises.

11. Makepeace contemplated that Crane would obtain construction financing to construct single family residences on the lots of the Crane Premises and sell the developed lots. On Crane's sale of developed lots, Crane would pay down its promissory note to Makepeace.

12. From 2006 through 2009, Makepeace conducted business, made telephonic, electronic, and written communications, and executed contract documents with Crane and Tihona in Rhode Island concerning the Crane Premises and Tihona Premises.

13. In 2009, Crane experienced cash flow shortfalls such that it was unable to meet all of its obligations under its promissory note and mortgage deed to Makepeace, including payment of interest on the promissory note and payment of real estate taxes on the Crane Premises.

14. Makepeace had an interest in preventing the Crane note and mortgage from going into default. Its interest in receiving current interest payments on the promissory note was outweighed by its interest in succeeding on its business plan of realizing the principal and interest on the promissory note through Crane's successful development of the Crane Premises.

15. Makepeace's business plan for the Crane Premises would be thwarted if Crane was unable to pay the real estate taxes on the Crane Premises, because of the risk that the property would be subjected to a tax sale by the Town of Wareham.

16. During 2009, Makepeace, as a means of protecting its interest in the Crane Premises and in realizing its business plan of liquidating its interest in the Crane Premises, negotiated with Crane to modify its agreement with Crane to deal with Crane's cash flow shortage. In such negotiations, Crane informed Makepeace that it had identified Lenders, who were Rhode Island residents, who would be willing to loan funds to Crane for payment of taxes and/or financing of construction of residences on the lots of the Crane Premises under certain conditions.

17. Crane communicated to Makepeace that the principal condition on which the Lenders insisted was that Makepeace agree to subordinate its first mortgage to a mortgage to be given by Crane to the Rhode Island Lenders to secure their loan.

18. As the means of inducing the Lenders to loan funds to Crane, Makepeace agreed that it would subordinate its mortgage to a mortgage granted by Crane to the Lenders.

19. To document its promise to the Lenders that it would subordinate its mortgage to a mortgage given by Crane to the Lenders, Makepeace and Crane executed two loan modification agreements as of December 31, 2009.

20. In one loan modification agreement, Makepeace agreed that it would subordinate its mortgage to a mortgage given by Crane to Lenders to secure a construction loan, and agreed that it would subordinate its mortgage to a mortgage given by Crane to Lenders for a loan, not to exceed $200,000, for payment of real estate taxes on the Crane Premises, upon Makepeace's approval of the terms and provisions of the construction loan mortgage and/or the real estate tax loan, such approval not to be unreasonably withheld or delayed.

21. As further inducement to the Lenders to make the contemplated loan to Crane, Makepeace in the second loan modification agreement agreed that it would permit a portion of the sales proceeds from the sale of any lot in the Crane Premises to be paid to Lenders.

22. Pursuant to its agreement to subordinate its mortgage to a mortgage given by Crane to the Lenders, and to document and confirm that agreement, Makepeace in September, 2010, prepared a form of subordination agreement in favor of the Lenders, sent it to Crane for review and approval, and represented that it would execute the subordination agreement.

23. Makepeace entered into the loan modification agreements, prepared the subordination agreement, sent it to Crane, and represented that it would execute the subordination agreement all with the expectation and intention that its acts, communications and representations would be transmitted and presented to the Lenders in Rhode Island, for the purpose of inducing the Lenders to enter into a loan agreement with and to loan money to Crane for Makepeace's benefit.

24. In specific reliance on Makepeace's representations and promises that it would subordinate its mortgage to a mortgage given by Crane to the Lenders, the Lenders entered into a loan agreement with Crane in which they agreed to loan Crane a total of $200,000, with interest at the rate 10 percent per annum, for the payment of real estate taxes or for the financing of construction of a dwelling on a lot on the Crane Premises. The Lenders' loan agreement with Crane and Crane's mortgage to Lenders contained standard terms and provisions to which Makepeace could not reasonably object.

25. Pursuant to the Lenders' loan agreement with Crane and Crane's mortgage to Lenders, Lenders are entitled to be paid their costs and expenses, including counsel fees, for any action taken to enforce and collect upon Crane's promissory note to Lenders.

26. In specific reliance on Makepeace's representations and promises that it would subordinate its mortgage to a mortgage given by Crane to the Lenders, the Lenders loaned $200,000 to Crane pursuant to their loan agreement with Crane.

27. The funds Crane borrowed from Lenders were used by Crane for the payment of real estate taxes on the Crane Premises. Crane's use of the Lenders' loan proceeds for payment of the real estate taxes on the Crane Premises conferred a real, concrete benefit on Makepeace.

28. On June 5, 2014, Makepeace made demand on Crane for the payment of Makepeace's purchase money loan to Crane for the Crane Premises, and represented that it would commence to foreclose on the Crane Premises pursuant to Crane's mortgage to Makepeace.

29. Makepeace has represented to the Lenders that it will refuse to honor its agreement to subordinate its mortgage to the mortgage given by Crane to the Lenders.

## COUNT I – BREACH OF CONTRACT

30. Plaintiffs realleges each and every allegation contained in paragraphs 1 through 29 as if separately set forth herein.

31. Makepeace offered to Lenders that it would subordinate its mortgage on the Crane Premises to a mortgage to be given by Crane to Lenders to secure the Lenders' loan to Crane, in exchange for Lenders' agreement to loan funds to Crane.

32. Lenders accepted Makepeace's offer and, pursuant to the contract formed by their acceptance of the offer, loaned $200,000 to Crane.

33. The proceeds of the Lenders' loan to Crane were used for the payment of real estate taxes on the Crane Premises.

34. Makepeace's refusal to honor its promise to subordinate its mortgage to the mortgage given by Crane to Lenders is a breach Makepeace's contract with Lenders.

35. Lenders will suffer damages in the amount $200,000, plus accrued interest, and counsel fees, on account of Makepeace's breach of its agreement with Lenders.

## COUNT II - ESTOPPEL

36. Plaintiffs realleges each and every allegation contained in paragraphs 1 through 29 as if separately set forth herein.

37. Makepeace represented to Lenders that it would subordinate its mortgage on the Crane Premises if the Lenders would loan money to Crane for payment of real estate taxes and/or construction of a dwelling on a lot of the Crane Premises.

38. In reasonable reliance on Makepeace's representation, Lenders executed a loan agreement with Crane and loaned Crane $200,000 pursuant to the loan agreement.

39. Lenders acted to their detriment in advancing loan proceeds to Crane in reliance on Makepeace's representation.

40. Makepeace has derived significant benefit from Lenders' loan of funds to Crane, enabling Crane to pay real estate taxes on the Crane Premises.

41. It would be inequitable and unjust for Makepeace to obtain the benefits from Lenders' detrimental reliance on Makepeace's representations while repudiating its promise to subordinate its mortgage to Crane's mortgage to Lenders.

## COUNT III – INJUNCTIVE RELIEF

42. Plaintiffs realleges each and every allegation contained in paragraphs 1 through 41 as if separately set forth herein.

43. Plaintiffs have a strong likelihood of prevailing on the merits of their claim against Makepeace.

44. Plaintiffs' loan to Crane is secured by Crane's mortgage to Lenders on the Crane Premises.

45. Makepeace's intended foreclosure of its mortgage on the Crane Premises, and refusal to honor its agreement to subordinate its mortgage to Crane's mortgage in favor of Lenders, will eliminate the security for Lenders' loan to Crane.

46. Lenders will suffer irreparable harm if Makepeace succeeds in eliminating the security for Lenders' loan to Crane, because Crane will likely have no ability to repay the loan after a foreclosure by Makepeace.

WHEREFORE, Plaintiffs demand judgment against Makepeace:

a) For monetary damages in the amount $200,000, plus accrued interest in accordance with the terms of the Plaintiffs' loan agreement with Crane, and pre- and post-judgment interest, and counsel fees;

b) For a preliminary and permanent injunction preventing Makepeace from taking any steps to foreclose as mortgagee on Crane's mortgage to Makepeace until and unless Makepeace honors its agreement to subordinate its mortgage to Crane's mortgage to Lenders.

PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

DEBORAH E. KELSEY, LYN COMFORT, R. DANIEL PRENTISS, AND JAY R. WILSON

By their attorneys

June 13, 2014
Date

R. Daniel Prentiss, Esq. (#0783)
**R. DANIEL PRENTISS, P.C.**
One Turks Head Place, Suite 380
Providence, RI 02903
Tel: 401-824-5150
Fax: 401-824-5181
dan@prentisslaw.com

8